UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
JACK URBONT,

                    Plaintiff,

           - against -

SONY MUSIC ENTERTAINMENT d/b/a
EPIC RECORDS, DENNIS COLES p/k/a
GHOSTFACE KILLAH, and RAZOR SHARP
RECORDS, LLC,

                    Defendants.
----------------------------------X

**MEMORANDUM AND ORDER**

11 Civ. 4516 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


     Plaintiff Jack Urbont ("Urbont") brings this action against
defendants Dennis Coles p/k/a Ghostface Killah, Sony Music
Entertainment d/b/a Epic Records, and Razor Sharp Records, LLC
(together with Sony Music Entertainment, "Sony"), alleging
infringement of his rights to the musical composition and sound
recording of the "Iron Man Theme."  Presently before the Court is
Urbont's motion for partial summary judgment against Sony, seeking
a determination that Sony is liable for copyright infringement,
unfair competition, and misappropriation, and Sony's cross-motion
for summary judgment, seeking dismissal of Urbont's claims.  For
the reasons stated below, Urbont's motion is denied and Sony's
motion is granted.

1

**BACKGROUND**[1]

### I.  Factual Background

Urbont is a "lifelong songwriter, conductor, orchestrator and music producer," who has contributed to musical productions in theater, film, radio, and television.  Am. Cmplt. ¶¶ 5, 10.  His work in television has been particularly extensive, with Urbont credited with developing themes for <u>The Guiding Light</u>, <u>One Life to Live</u>, and <u>General Hospital</u>, and music for shows such as <u>All My Children</u>, <u>That 70s Show</u>, <u>Oprah</u>, <u>Rosie</u>,and <u>Live with Regis and Kathie Lee</u>.  <u>Id.</u> ¶ 11.

In his first foray into creating music for use in television, Urbont developed several theme songs for superhero characters featured in the 1966 television show, <u>Marvel Super Heroes</u> (the "Program").  Def's 56.1 ¶¶ 1, 14, 17; Urbont Decl. ¶ 12.  Urbont wrote theme songs for segments involving Captain America, Hulk, Thor, and Sub-Mariner, as well as an opening song entitled "The

---

[1]  This background is derived from the following sources: (1) the amended complaint filed August 29, 2011 ("Am. Cmplt."); (2) Plaintiff's Notice of Undisputed Facts in Support of Jack Urbont's Motion for Summary Judgment ("Pl's 56.1"); (3) the Declaration of Jack Urbont ("Urbont Decl.") and exhibits attached thereto; (4) Defendants' Statement of Material Facts Pursuant to Local Rule 56.1(a) in Support of Defendants' Motion for Summary Judgment and Counter-Statement of Material Facts Pursuant to Local Rule 56.1(b) in Opposition to Plaintiff's Motion for Summary Judgment ("Def's 56.1"); (5) Defendants' Opposition to Plaintiffs' Statement of Facts Pursuant to Local Rule 56.1; (6) the Declaration of G. Wade Leak in Support of Motion for Summary Judgment, and exhibits attached thereto; (7) the Declaration of Marc S. Reiner in Support of Motion for Summary Judgment, and exhibits attached thereto, including the transcript of Urbont's deposition ("Tr."); (8) Plaintiff's Response to Defendant's Rule 56.1 Statement; and (9) the Declaration of Andrew Coffman, and exhibits attached thereto.

Marvel Superheroes Have Arrived" and a closing song entitled "The Merry Marvel Marching Society."  Def's 56.1 ¶¶ 14-15.  At issue in this litigation is the musical composition and sound recording of the "Iron Man Theme," which served as the theme song for the "Iron Man" segment of the Program.

Urbont had not been familiar with any of the Marvel superheroes before he was introduced to the Program, and he had not previously written songs that could have been used by Marvel. Id. ¶¶ 9-10.  Rather, after being put in touch with Marvel's Stan Lee by a mutual friend, Urbont asked for the opportunity to be "the guy to do the songs for the series."  Tr. at 20.  Willing to hear Urbont's submissions, Marvel told Urbont which characters would be featured in the Program and provided him with comic books from which to source his composition.  Def's 56.1 ¶ 12; Tr. at 31-32.  After he "looked over the material[ and] absorbed the nature of the character," Urbont composed the superhero theme and presented it to Stan Lee for Marvel's approval.  Def's 56.1 ¶ 19; Tr. at 24.  Marvel had the right to reject the songs submitted by Urbont; however, Urbont's compositions were ultimately accepted as written.  Def's 56.1 ¶ 20; Tr. at 21.

After Marvel accepted his songs, Urbont informed Marvel that he had not yet been paid and that he needed money to pay for musicians and recording costs.  Def's 56.1 ¶ 22; Tr. at 25-26.  As a result, Urbont received the fixed sum of $3,000, which he

3

subsequently used to create the sound recording by hiring musicians, renting a studio, and supervising the recording of the master recording.  Def's 56.1 ¶ 23; Pl's. 56.1 ¶ 6.  This sound recording of the "Iron Man Theme" (the "Iron Man Recording"), which would play during the introduction to the Iron Man segment of the Program, was never released as a separate phonorecord or other audio recording without a visual component.[2]  <u>Id.</u> ¶ 26.

At the time of the songs' development, Marvel and Urbont did not enter into a written agreement concerning a license for the use of the songs in the Program.  <u>Id.</u> ¶ 28; Tr. at 49 ("I have no written agreement in my files, and I have no recollection of any written agreement").  Nor did Urbont enter into a royalty agreement with Marvel in connection with the show, although Urbont claims that he did later receive some royalty payments.  Def's 56.1 ¶¶ 25; Tr. at 35.

Urbont alleges that he was issued a certificate of registration for the musical composition of the "Iron Man Theme" ("Iron Man Composition") and that he filed a renewal notice for the composition in 1994.  Pl's 56.1 ¶¶ 3-4; Urbont Decl., Ex. 1. He has since licensed the Iron Man Composition for use in the <u>Iron</u>

---

[2] As a result, to the extent that the Iron Man Recording was copied, Urbont concedes that it must have been copied from an audiovisual work.  <u>Id.</u> ¶ 26.

<u>Man</u> film and has licensed several other of his superhero themes. Pl's 56.1 ¶¶ 9-10; Urbont Decl., Exs. 2-4.

In 1995, Urbont entered into a settlement agreement (the "Settlement") with New World Entertainment, Ltd. and Marvel Entertainment Group, Inc. (collectively, "Marvel"), following Urbont's commencement of a suit against Marvel for unauthorized use of the Iron Man Composition and four other superhero compositions.  Pl's 56.1 ¶ 11; Urbont Decl., Ex. 6.  Marvel had sought registration for the Iron Man segments of the Program but had not made reference in its application to any preexisting copyrighted works incorporated in the Program.  Def's 56.1 ¶ 31. The Settlement releases Urbont's claims against Marvel and grants Marvel exclusive rights to use the compositions in synchronization with the Program in exchange for payment of $90,000.  Urbont Decl., Ex. 6.  Throughout, the Settlement refers to Urbont as "Owner" and to Marvel as "Licensee," and it describes Urbont "as renewal copyright owner of the [Iron Man Composition] and the Master Recording[] thereof."  <u>Id.</u>  However, at no point in the Settlement does Marvel explicitly state that Urbont is the owner of the works or quitclaim any rights.  Nor, as Urbont admits, does the Settlement constitute or include any transfer or assignment of

rights.   <u>See</u> Tr. at 85.    The Settlement also expressly states that it does not constitute or contain any admission of liability.

In 2000, Coles, a hip-hop artist popularly known as "Ghostface Killah," produced a solo album entitled <u>Supreme Clientele</u>.   Def's 56.1 ¶ 43.   Urbont alleges that Coles "copied verbatim" the sound recording and musical composition of the "Iron Man Theme" on the first and last tracks of <u>Supreme Clientele</u>, titled "Intro" and "Iron's Theme – Conclusion," respectively.   Am. Cmplt. ¶¶ 23, 37. Urbont further alleges that Sony, which released the album, has received substantial revenue from the distribution, reproduction, and display of these infringing works.   <u>Id.</u> ¶¶ 24, 26.   After discovering the alleged infringement sometime in late 2009 or early 2010, <u>id.</u> ¶ 39, Urbont contacted Sony on March 18, 2010, asserting that he was the owner of the Iron Man Composition and Recording and that both works were illegally reproduced on <u>Supreme Clientele</u>. Def's 56.1 ¶ 46.   Urbont eventually entered into a tolling agreement with defendants, stopping the statute of limitations running against his claims as of May 21, 2010. Am. Cmplt. ¶ 39.


## II.  Procedural Background

Urbont filed a complaint on June 30, 2011, and an amended complaint on August 29, 2011.  The Amended Complaint asserts claims for copyright infringement under the Copyright Act, 17 U.S.C. § 101 <u>et seq.</u>, as well as claims under New York common law for

copyright infringement, unfair competition, and misappropriation. The federal claim pertains only to the Iron Man Composition, while the state law claims pertain only to the Iron Man Recording.[3]

On August 5, 2011, Sony moved to dismiss Urbont's federal claims for sales prior to May 2007 and his state law claims as time-barred.  On March 27, 2012, we issued an opinion granting in part and denying in part the motion.  We held that the injury rather than the discovery rule determined the accrual of infringement claims under the Copyright Act.[4]  As a result, Urbont's federal claims prior to May 21, 2007 were found to be time-barred, while his state law claims, though likewise limited to post-2007 acts, were not time-barred.[5]

On January 14, 2015, Urbont moved for partial summary judgment against Sony, and Sony cross-moved for summary judgment on February 17, 2015.  The motions were fully briefed on March 31, 2015.

---

[3] This distinction arises because the Copyright Act does not currently apply to sound recordings created prior to February 15, 1972. See Capitol Records, Inc. v. Naxos of Am., Inc., 4 N.Y.3d 540, 555–56 (2005); see also Melville B. Nimmer & David Nimmer, 4 Nimmer on Copyright § 2.10[A][1] (2011).

[4] Following our decision, the Second Circuit in Psihoyos v. John Wiles & Sons, Inc., 748 F.3d 120 (2d Cir. 2014), held that the discovery rather than the injury rule governs claim accrual in copyright infringement actions.

[5] In addition, on March 28, 2012, Coles filed a motion to dismiss for insufficient service of process, challenging Urbont's attempted service on Coles through Coles's business manager.  On May 4, 2012, we held that the service on Coles had been ineffective, but that Urbont could subsequently serve Coles by publication notice.  After a period of discovery, Coles's counsel withdrew on February 6, 2014, and Coles ceased to participate in the litigation, causing Urbont to move for sanctions against Coles.  We granted this motion for sanctions against Coles on November 6, 2014, ordering Coles to pay Urbont the sum of $3,758.58 and entering judgment against Coles.

7

**DISCUSSION**

**I.   Cross-Motions for Summary Judgment**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" rather, "the requirement is that there be no genuine issue of material fact." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). When determining whether a genuine issue of material fact exists, a court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010). A fact will be deemed material "when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).

When cross-motions for summary judgment are made, the standard is the same as that for individual motions for summary judgment. Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

8

## II.  Urbont's Federal Copyright Act Claims

Federal "[c]opyright infringement is established by proving 'ownership of a valid copyright' and 'copying of constituent elements of the work that are original.'" Boisson v. Banian, Ltd, 273 F.3d 262, 267 (2d Cir. 2001) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)).  Ownership is generally established by production of a certificate of registration, as a certificate of registration made before or within five years after first publication of the work constitutes prima facie evidence of the validity of the copyright.  Hamil Am. Inc. v. GFI, 193 F.3d 92, 98 (2d Cir. 1999).  Actionable copying is established by proof of both factual copying and "substantial similarity" between protectable elements of plaintiff's work and the allegedly copied portions of defendants' work.  Boisson, 273 F.3d at 267-68.

Here, Urbont asserts that he is the owner of a valid copyright in the Iron Man Composition because there is an initial registration that lists him as "author" and a renewal registration that lists him as owner.  Sony, however, challenges Urbont's ownership by asserting that the Iron Man Composition was made as a "work for hire" and is therefore owned by Marvel, for whom Urbont created the composition.[6]  As set forth below, we find that Sony

_____

[6] Sony also argues that inconsistencies in Urbont's assertions as to who owns and controls the Iron Man Composition undermine his claim of ownership.

has demonstrated that the Iron Man Composition was made for hire, defeating Urbont's claim of ownership and entitling Sony to summary judgment on Urbont's federal claims.

### A. Sony's Standing to Challenge Urbont's Ownership

As an initial matter, Urbont seeks to forestall Sony's challenge by arguing that Sony, as a third-party infringer which does not itself claim ownership of the Iron Man Composition, lacks standing to dispute Urbont's ownership. Specifically, Urbont argues that Sony is precluded from claiming that Marvel is the owner of the Iron Man Composition because Marvel itself has not claimed ownership, but rather, according to Urbont, has acknowledged Urbont as the Composition's owner in the Settlement.[7] See Pl's Opp'n at 2.

In support of this position, Urbont points to cases involving Section 204 of the Copyright Act, a statute-of-frauds provision requiring memorialization of a transfer of copyright ownership. See 17 U.S.C. § 204(a). Several cases under Section 204 have held that a defendant cannot defeat an infringement claim solely by challenging the transferring parties' failure to produce a written

---

Because we conclude that the Iron Man Composition is a work for hire, we do not reach this argument.

[7] We note that, as discussed later, we do not accept Urbont's implicit conclusion here that the Settlement demonstrates Marvel's agreement that Urbont owns the Composition and its relinquishment of any dispute regarding, or claim to, its ownership. See infra II.B.iii.

document memorializing the transfer, where the transferring parties do not dispute that the transfer occurred or that the transferee is the rightful owner. See Eden Toys, Inc. v. Florelee Undergarment Co., 697 F.2d 27, 36 (2d Cir. 1982) ("In this case, in which the copyright holder appears to have no dispute with its licensee on this matter, it would be anomalous to permit a third party infringer to invoke this provision against the licensee."); Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 830 (3d Cir. 2011) ("At least where there is no dispute between transferor and transferee regarding the ownership of a copyright, there is little reason to demand that a validating written instrument be drafted and signed contemporaneously with the transferring event."). Urbont asserts that these cases stand for the broader proposition that "[a] third-party infringer does not have standing to challenge the ownership of a copyright as between two other parties," Pl's Opp'n at 2, and that Sony therefore has no standing to challenge Urbont's ownership.

However, these cases fail to support the conclusion-- preclusion of any challenge to his ownership--that Urbont seeks here.  For one, such preclusion has occurred solely in the context of Section 204 challenges to the validity of copyright transfers. See, e.g., Eden Toys, 697 F.2d at 36 ("[I]t would be anomalous to permit a third party infringer to invoke this provision against the licensee.") (emphasis added).  This case, however,

11

indisputably does not concern Section 204: as both parties agree, there is no transfer of ownership at issue here, no less a dispute concerning the documentation of such a transfer.  As such, the cited cases are inapt.

More importantly, the logic underlying preclusion in the Section 204 context does not support preclusion of all ownership challenges, as Urbont would have us hold.  Section 204 is a narrow statute-of-frauds provision, which was created primarily for the benefit of the copyright holder.  See Eden Toys, 697 F.2d at 36 ([T]he purpose of the provision is to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses . . . .").  It follows that courts would refuse to allow a defendant to escape liability for infringement based solely on the technicality of memorialization required by this provision, where the lack of a dispute between the transferring parties confirms that it is merely a technicality.  Ownership nevertheless remains an essential element of a plaintiff's infringement claim, one which the plaintiff bears the burden of proving, which defendants routinely challenge to escape liability, and which exists, in part, to protect defendants from being overly constricted in their ability to create and copy.  Thus, where defendants seek to raise a meaningful challenge to the plaintiff's infringement claim by positing ownership in a third party, the seeming absence of a dispute between the putative owners should not forestall such a

12

challenge.    Indeed,  the  very  cases  precluding  Section  204 challenges  confirm  this  principle,  as  they  permit  defendants  to challenge  the  underlying  transfer  (i.e.,  ownership)  even  as  they preclude  challenges  to  the  transfer's  documentation.   See  Eden Toys,  Inc.,  697  F.2d  27,  36)  (while  precluding  challenge  to validity  of  any  written  memorialization,  remanding  to  determine whether  there  was  a  valid  underlying  transfer  of  ownership);  Bunge, 632  F.3d  822,  830  (permitting  challenge  to  transfer  of  ownership and  upholding  summary  judgment  on  the  ground  that  no  transfer occurred).

Finally,  while  "[c]ourts  have  not  dealt  with  this  issue extensively,"  decisions  addressing  "the  question  whether Defendants  have  standing,  as  third  parties  to  the  purported employer-employee  relationship,  to  raise  a  'work  for  hire' defense"  "have  generally  found  that  a  defendant  does  have  standing to  challenge  ownership  on  this  basis."  Psihoyos v. Pearson Educ., Inc., 855  F.  Supp.  2d  103,  117  n.7  (S.D.N.Y.  2012)  (collecting cases).

As  a  result,  we  find  that  Sony  is  not  precluded  from  arguing that  the  Iron  Man  Composition  is  a  work  for  hire  owned  by  Marvel rather  than  Urbont,  and  we  address  this  argument  below.

**B. The "Iron Man Composition" is a Work for Hire**

**i. The Work-for-Hire Standard**

Under the 1909 Act,[8] the determination of whether a work is a work for hire is governed by the "instance and expense" test.  See Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 380 F.3d 624, 634-35 (2d Cir. 2004) ("The copyright belongs to the person at whose "instance and expense" the work was created,  . . . whether the work was created by a traditional employee or an independent contractor.").  As the name suggests, the test requires a court to evaluate both whether a work was made at the employer's "instance" and whether it was made at the employer's "expense," as described below.

First, in evaluating whether a work was made at the employer's "instance," courts consider whether "the motivating factor in producing the work was the employer who induced the creation." Siegel v. Nat'l Periodical Publications, Inc., 508 F.2d 909, 914 (2d Cir. 1974).  Specifically, "[i]f the hiring party 'took the initiative in engaging [the artist]'" or if the artist "would not have created the work but for the hiring party's assignment to do so, then the work is made at the hiring party's 'instance.'" Estate of Hogarth v. Edgar Rice Burroughs, Inc., 00 Civ. 9569

---

[8] Because the Iron Man Composition was created before 1978, it is governed by the 1909 Act and the case law construing that statute.  See Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 553 (2d Cir. 1995).

(DLC), 2002 WL 398696, at *18 (S.D.N.Y. Mar. 15, 2002) <u>aff'd sub</u>
<u>nom.</u> <u>Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.</u>, 342
F.3d 149 (2d Cir. 2003) (quoting <u>Picture Music, Inc. v. Bourne,</u>
<u>Inc.</u>, 457 F.2d 1213, 1217 (2d Cir. 1972)). <u>See also, e.g.</u>, <u>Marvel</u>
<u>Characters, Inc. v. Kirby</u>, 726 F.3d 119, 141 (2d Cir. 2013) <u>cert.</u>
<u>dismissed,</u> 135 S. Ct. 42 (2014) ("[The artist's] works during this
period were hardly self-directed projects in which he hoped Marvel,
as one of several potential publishers, might have an interest;
rather, he created the relevant works pursuant to Marvel's
assignment or with Marvel specifically in mind [and therefore made
them at Marvel's instance]."); <u>Picture Music, Inc.</u>, 457 F.2d at
1216 (finding "the 'motivating factors' in the composition of the
new song, 'Who's Afraid of the Big Bad Wolf,' were Disney and
Berlin" where Disney and Berlin approached the artist and provided
her with the film's musical score to adapt into the song); <u>Playboy</u>
<u>Enterprises, Inc. v. Dumas</u>, 53 F.3d 549, 556 (2d Cir. 1995)
("Playboy gave Nagel specific assignments and often asked him to
illustrate particular articles that were to appear in <u>Playboy</u>
magazine. It is safe to say that during this phase of their
relationship, Playboy was the "motivating factor" in the creation
of the paintings."); <u>Siegel</u>, 508 F.2d at 914 (finding <u>Superman</u> was
not a work for hire because it had been created by plaintiffs four
years before meeting defendants).

Courts also consider, as evidence of creation at the employer's instance, whether the employer retained the right "to direct and supervise the manner in which the [artist] performs his work." Dumas, 53 F.3d at 554. See, e.g., Picture Music, Inc., 457 F.2d at 1216 (finding work done at employer's instance where employer made revisions); Estate of Hogarth, 2002 WL 398696, at *19 (same); Kirby, 726 F.3d at 141 (finding work done at employer's instance even where the artist "undoubtedly enjoyed more creative discretion than most artists did under the 'Marvel Method,'" because "he worked within the scope of Marvel's assignments and titles" and because "Marvel had the power to reject Kirby's pages and require him to redo them, or to alter them, a power it exercised from time to time"). Notably, this "right to direct and supervise the manner in which work is created need never be exercised." Martha Graham Sch., 380 F.3d at 635; see also Ward v. Nat'l Geographic Soc., 208 F. Supp. 2d 429, 437 (S.D.N.Y. 2002) ("[L]ack of direct supervision during the actual creation of the work is immaterial if, as here, the hiring party took the initiative in engaging the independent contractor and had the power to accept, reject, or modify the work.").

Second, in evaluating whether a work was made at the employer's "expense," the primary question before a court is whether the employee was paid a fixed sum. See Dumas, 53 F.3d at 555 ("Our prior cases on work for hire under the 1909 Act have

16

found the 'expense' requirement to be met where a hiring party simply pays an independent contractor a sum certain for his or her work."). The payment of royalties can weigh against finding that the expense requirement has been met, but will not vitiate such a finding so long as the employee has also received a fixed sum. See Estate of Hogarth, 2002 WL 398696, at *20 ("Where, as here, the creator receives both a fixed sum *and* royalties, the fact that the creator received a fixed sum is sufficient to meet the requirement that the works be made at the employer's expense."). Rather, the question is whether the employee bore the "full assumption of the risk of loss on the project." Id. If he did not, as where he receives a sum certain from the employer, then the project has occurred at the employer's expense. See also, e.g., Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc., 08 Civ. 6143 (DLC), 2010 WL 3564258, at *9 (S.D.N.Y. Sept. 10, 2010) ("[The employer] was also responsible for the expense of creating the Sound Recordings. The . . . Agreements each provided that [the employer] would pay Bob Marley certain advances against royalties for the creation of the Sound Recordings. In addition, the . . . Agreements stated that [the employer] would advance Bob Marley the recording costs for the albums produced pursuant to these agreements, which could only be recouped from royalties. . . . Thus, [the employer] bore the expense associated with the creation of the Sound Recordings.").

17

Finally, though variously understood as an element of both "instance" and "expense" prongs, courts have suggested that an artist's creation is likely to be a work for hire when it is necessarily derivative of the employer's preexisting work. See Picture Music, Inc., 457 F.2d at 1216 (noting that the artist's work was made at the employer's instance in part because "Disney had control of the original song on which Miss Ronell's work was based, [such that] Disney (and Berlin, with Disney's permission), at all times had the right to 'direct and supervise' Miss Ronell's work"); Kirby, 726 F.3d at 143 (noting that the artist's work was made at the employer's expense in part because the artist's drawings "were generally not free-standing creative works, marketable to any publisher as a finished or nearly finished product," but instead "built on preexisting titles and themes that Marvel had expended resources to establish--and in which Marvel held rights--and they required both creative contributions and production work that Marvel supplied," such that any current value in the artist's works "is therefore in substantial part a function of Marvel's expenditures over and above the flat rate it paid [the artist] for his drawings").

### ii. The "Iron Man Composition"

Here, both "instance" and "expense" prongs support a finding that the Iron Man Composition was made for hire.

18

First, the Iron Man Composition was created at Marvel's instance because it was developed to Marvel's specifications and for Marvel's approval.  As in Kirby, Urbont's compositions "were hardly self-directed projects in which he hoped Marvel, as one of several potential publishers, might have an interest . . . ."  726 F.3d at 141.  Rather, Urbont was introduced to Marvel's Stan Lee by a mutual friend who "knew that they were planning a cartoon series and [] thought I would be a good guy to do the songs for the series."  Tr. at 20.  After pitching himself to Lee, Urbont was given source material from which to write certain themes.  He had no familiarity with the characters or comics and had not been working on any such theme songs before meeting with Lee and being directed toward source material.  Because Urbont "created the relevant work[] pursuant to Marvel's [direction and] with Marvel specifically in mind," 726 F.3d at 141, Marvel was clearly "the motivating factor in producing the work."

Marvel also retained a right to direct Urbont's work.  Urbont presented his proposed themes to Lee, who "had the right to say I like it or I don't like it, we'll use it or we won't use it."  Id. at 24.  Although Marvel did not revise Urbont's submissions, and Urbont asserts that Marvel was not entitled to modify them without his consent, Marvel did retain control over Urbont's work insofar as it clearly retained the right to accept or reject the songs.  Marvel also determined the subject matter and scope of Urbont's

compositions by first creating and then providing Urbont with the copyrighted material he would adapt and build on, likewise suggesting that Marvel retained control over Urbont's creative output. See Picture Music, Inc., 457 F.2d at 1216 ("[S]ince Disney had control of the original song on which Miss Ronell's work was based, Disney (and Berlin, with Disney's permission), at all times had the right to 'direct and supervise' Miss Ronell's work.").

Second, the "Iron Man Composition" was created at Marvel's expense because Urbont was paid the fixed sum of $3,000 for his work. Although Urbont did not receive a fixed salary and was not barred from undertaking other projects, these facts do not suffice to establish that a work is not made at an employer's expense. See Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1216 (2d Cir. 1972) ("The absence of a fixed salary, however, is never conclusive, nor is the freedom to do other work, especially in an independent contractor situation."). Likewise, the fact that Urbont may have received royalties is not sufficient to prove that his work was done at Marvel's expense. See Estate of Hogarth, 2002 WL 398696, at *20.

Accordingly, we find that the Iron Man Composition was made at both Marvel's instance and its expense and was therefore made as a work for hire.

### iii. The Settlement Agreement

Once the instance and expense test has been met, "a presumption arises that the works in question were 'works made for hire.' . . . This presumption can be overcome only by evidence of an agreement to the contrary contemporaneous with the creation of the works." Kirby, 726 F.3d at 143. See also Archie Comic Publications, Inc. v. DeCarlo, 258 F. Supp. 2d 315, 330 (S.D.N.Y. 2003) aff'd, 88 F. App'x 468 (2d Cir. 2004) and aff'd, 88 F. App'x 468 (2d Cir. 2004) ("[I]t is [plaintiff]'s burden to produce evidence which, if credited, would permit a trier of fact reasonably to conclude, by clear and convincing evidence, that [plaintiff and his employer] agreed that [plaintiff] would own the copyright to his pre-1978 contributions . . . notwithstanding the 'almost irrebutable' presumption that these were works for hire.").

Here, Urbont has provided no evidence of an agreement dating from the time of the Iron Man Composition's creation to contradict the presumption that the Composition was a work for hire. See Tr. at 49 ("I have no written agreement in my files, and I have no recollection of any written agreement"). Rather, Urbont contends that the 1995 Settlement provides proof of Urbont's ownership sufficient to overcome any such presumption. He notes that the Settlement consistently refers to Urbont as "Owner" and that it professes to bestow Marvel with licensing rights from Urbont, a

transaction he claims would make little sense if Marvel considered itself the copyright owner. As such, Urbont argues, the Settlement provides conclusive evidence that Marvel believes--and the court should therefore also believe--that Urbont, rather than Marvel, is the owner of the Iron Man Composition.

However, we find the Settlement insufficient to overcome our conclusion that the Iron Man Composition was made for hire. First and foremost, a settlement is merely that: the resolution of a dispute between two parties. "[A] settlement does not mean that the claim had merit or that it would have withstood scrutiny," Taylor v. First Med. Mgmt., 508 F. App'x 488, 497 (6th Cir. 2012), and it "is not a concession by a defendant that a claimant's argument, legal or factual, has merit," Lynn v. CSX Transp., Inc., 84 F.3d 970, 974 (7th Cir. 1996). Rather, "pre-trial settlements are made for many reasons (one of them being to save money in the long run) and do not suggest liability on anyone's part." Schaer v. City of New York, 09 Civ. 7441 CM MHD, 2011 WL 1239836, at *13 (S.D.N.Y. Mar. 25, 2011).[9] Thus, the fact that Marvel entered into a licensing settlement with Urbont does not mean that Marvel has concluded or conceded that Urbont is the Composition's owner, and

---

[9] Indeed, it is not difficult to imagine reasoning that would lead Marvel to conclude that entering into a modest settlement--$90,000 for claims involving five different works--was preferable to engaging in a costly dispute requiring a detailed exploration of the events of thirty years prior.

it does not compel a finding that, contrary to our work-for-hire analysis, Urbont originally owned the Composition.

Rather, case law within the copyright infringement context affirms that a licensing or settlement agreement should not supplant a court's independent determination of copyright ownership. This principle can be seen, for instance, in the context of licensee estoppel: courts have repeatedly held that where two parties enter into a settlement or licensing agreement, the licensee is not estopped from later challenging the purported licensor's ownership. See, e.g., Melchizedek v. Holt, 792 F. Supp. 2d 1042, 1056-57 (D. Ariz. 2011) (refusing to estop defendants from challenging copyright where defendants had previously entered into licensing agreement with plaintiff and now argued that plaintiff's copyright was abandoned, stating that "[t]he Court will not apply the quasi estoppel doctrine where the purported unconscionable conduct and injustice is the result of a party's belief that something might not be as contracted for, and election to enter into the contract notwithstanding the risk"); FM Indus., Inc. v. Citicorp Credit Servs., Inc., 07 Civ. 1794, 2008 WL 162756, at *3 (N.D. Ill. Jan. 14, 2008) (rejecting the claim that defendant "is estopped from contesting [plaintiff]s copyright ownership because [it] acknowledged [plaintiff's] . . . ownership in the parties' licensing agreement" and noting that "application of the licensee estoppel doctrine is disfavored in copyright cases");

Twin Books Corp. v. Walt Disney Co., 877 F. Supp. 496, 500 (N.D. Cal. 1995) rev'd on other grounds, 83 F.3d 1162 (9th Cir. 1996) (rejecting licensee estoppel argument where defendant had executed licensing agreement with plaintiff after "extensive negotiations" and then argued that copyright had fallen into public domain).

The conclusion that a settlement agreement should not bind a court's determination of copyright ownership is even more persuasive where, as here, the parties to the settlement are not the same as the parties to the current litigation.   Put differently, if a company's decision to enter into a licensing agreement with a plaintiff will not prevent it from later proving that in fact the copyright was never the plaintiff's to license, that company's decision surely should not serve to preclude a third party, which never entered into such an agreement, from proving the same.

The principles underlying the "instance and expense" test also support limiting agreements capable of overcoming a court's work-for-hire analysis to those dating from the work's creation. The "instance and expense" test is designed to assess the parties' historical relationship in order to determine in whom the copyright inhered at its creation.   Cf. Twentieth Century Fox Film Corp. v. Entm't Distrib., 429 F.3d 869, 887 (9th Cir. 2005) ("[If it] were a work for hire, the copyright would have vested in [the employer] from the moment it was created.").   Unless the copyright is later

24

transferred, in whom the copyright originally inhered remains the essential question in determining ownership.  It follows, then, that only an agreement dating back to the work's creation would be able to accurately shed light on in whom the copyright vested at that time; by contrast, a settlement some thirty years after the work's creation can provide only limited insight into what the parties originally intended, no less in whom the copyright initially vested as a result of their actions.

Finally, our conclusion that the Settlement does not as a matter of law suffice to rebut a determination that the Composition was made for hire is supported by a recent Second Circuit case indicating that work-for-hire analyses should not turn on after-the-fact agreements.  In Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc., 716 F.3d 302, 316 (2d Cir. 2013), the plaintiff signed an agreement that purported to retroactively label him an "employee for hire," following enactment of the Copyright Act of 1976 and its requirement that a work for hire be so designated in writing if not made in the course of regular employment.  The court held that the agreement did not alter the court's evaluation of whether his work was made for hire under the "instance and expense" test, stating that "the Agreement appears to create an 'employee for hire' relationship, but the Agreement could not render Ghost Rider a 'work made for hire' ex post facto, even if the extrinsic evidence shows the parties had the intent to do so.  The 1909 Act

. . . requires us to look to agency law and 'the actual relationship between the parties, rather than the language of their agreements,' in determining the authorship of the work.  Thus, regardless of the parties' intent in 1978, the evidence must prove Ghost Rider was actually a 'work made for hire' at the time of its creation." Id. (quoting Marvel Characters, Inc. v. Simon, 310 F.3d 280, 291–92 (2d Cir. 2002).

Thus, we find that the Settlement does not cause us to reconsider our determination under the "instance and expense" test that the Iron Man Composition is a work for hire.  Accordingly, we find that Sony has established that Urbont is not the owner of the Iron Man Composition and we therefore dismiss Urbont's federal claims.

## III. Urbont's State Law Claims

Urbont also seeks recovery from Sony under New York state law for copyright infringement, unfair competition, and misappropriation.  Sony argues that these state law claims, each of which concerns only the Iron Man Recording, should be dismissed as preempted by the Copyright Act because the Iron Man Recording is not a "sound recording," expressly excluded from the Copyright Act's scope of preemption, but rather an "audiovisual work."  As set forth below, we agree and dismiss Urbont's state law claims.

26

State laws within the general scope of federal copyright protection were preempted by the Copyright Act of 1976. <u>See</u> 17 U.S.C. § 301(a). However, by an exception to its general preemption provisions, the Copyright Act allows state laws to continue to protect "sound recordings fixed before February 15, 1972." 17 U.S.C. § 301(c). "Sound recordings" are defined under the Act as "works that result from the fixation of a series of musical, spoken, or other sound, <u>but not including the sounds accompanying a motion picture or other audiovisual work</u> . . . ." 17 U.S.C. § 101 (emphasis added). Rather, such "accompanying sounds," including motion picture or television soundtracks, are included instead in the definition of "audiovisual works." <u>See</u> 17 U.S.C. § 101 (defining "audiovisual works" as "works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, <u>together with accompanying sounds</u>") (emphasis added); <u>id.</u> (defining "motion pictures" as "audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, <u>together with accompanying sounds</u>") (emphasis added). <u>See also</u> H.R. Rep. No. 94-1476 at 56 (1976), <u>reprinted in</u> 1976 U.S.C.C.A.N. 5659, 5669 ("Sound tracks of motion pictures, long a nebulous area in American copyright law, are specifically included in the definition of 'motion pictures,' and excluded in the definition of

'sound recordings.'"); cf. H.R. Rep. No. 92-487 (1971), reprinted in 1971 U.S.C.C.A.N. 1566, 1571 ("Thus, to take a specific example, if there is an unauthorized reproduction of the sound portion of a copyrighted television program fixed on video tape, a suit for copyright infringement could be sustained under section 1(a) of title 17 [of the 1909 Act, as a "motion picture,"] rather than under the provisions of this bill[, the 1972 Sound Recording Act, which created a copyright in sound recordings] . . . .") (emphasis added).

Legislative history does suggest that a soundtrack could constitute a "sound recording," rather than an "audiovisual work," if it is reproduced separately on a phonorecord. See H.R. REP. 94-1476, 64, 1976 U.S.C.C.A.N. 5659, 5677 ("The purely aural performance of a motion picture sound track, or of the sound portions of an audiovisual work, would constitute a performance of the 'motion picture or other audiovisual work'; but, where some of the sounds have been reproduced separately on phonorecords, a performance from the phonorecord would not constitute performance of the motion picture or audiovisual work."). In sum, then, infringement of a soundtrack, or of "the sound portion of a copyrighted television program," will constitute infringement of an "audiovisual work," unless the infringer has copied a phonorecord reproduction (which could be deemed a separate "sound recording") rather than the original visual-accompanying sounds.

28

Based upon the foregoing discussion, the Iron Man Recording must be deemed an "audiovisual work" and not a "sound recording," because it was created purely to accompany the television show and does not exist apart from the accompanying televisuals.   Urbont admits that the Iron Man Recording was not reproduced separately on a phonorecord and that defendants could only have copied it from the television program.   See Pl's Response to Def's Rule 56.1 Statement ¶ 26.   He argues instead that he produced a master tape of the song and that this master tape constitutes a separate "sound recording" for which he can recover.   However, all soundtracks-- including motion picture soundtracks, expressly excluded from the definition of "sound recording"--necessarily involve master tapes. Were the existence of these master tapes enough to transform soundtracks into "sound recordings," the exclusion of soundtracks from the definition of "sound recording" would serve little purpose.

In addition, authority supports our conclusion that where, as here, a soundtrack was created purely for incorporation into an audiovisual work, it is protected by the audiovisual copyright unless reproduced separately.   See Traicoff v. Digital Media, Inc., 439 F. Supp. 2d 872, 882-83 (S.D. Ind. 2006) (finding that recordings in computer software training programs were not "sound recordings" for which plaintiff could state a state law infringement claim, because "the audio recordings were made for

the sole purpose of accompanying the final audiovisual work"); Maljack Prods., Inc. v. GoodTimes Home Video Corp., 81 F.3d 881, 888 (9th Cir. 1996) (affirming dismissal of state law claims for protection of a film's soundtrack on the ground that the soundtrack was protected under the motion picture copyright and, as such, any state law claims were preempted); Toho Co. v. Priority Records, LLC, No. CV01-04744SVW (RZX), 2002 WL 33840993, at *3 (C.D. Cal. Mar. 27, 2002) (where defendants copied the theme song from the Godzilla movies, which appeared both in the motion picture and on soundtrack albums, distinguishing between infringement of the motion picture and infringement of the soundtrack albums and noting that "the sound track is an integral part of a motion picture, and as such fully protected by the motion picture copyright") (emphasis added). Cf. James v. Delilah Films, Inc. 144 Misc. 2d 374 (Sup. Ct. N.Y. 1989) (rejecting state law infringement claim where defendants copied film clips showing pre-recorded singing played alongside film of singers dancing and lip-syncing, on the ground that any infringement was of an "audiovisual work" because the "sound portion cannot be separated from the visual portion, merely to accommodate plaintiffs' assertion that they are entitled to an exemption [from preemption]").

Thus, we find that the Iron Man Recording constitutes an "audiovisual work" rather than a "sound recording," and consequently that Urbont's state law infringement claims

concerning the Recording are consequently preempted by the Copyright Act of 1976.   Sony is therefore entitled to summary judgment and Urbont's state law claims are dismissed.

## CONCLUSION

For the reasons stated above, Sony's motion for summary judgment is granted and Urbont's motion for summary judgment is denied.   This Memorandum and Order resolves docket nos. 57 and 63.

**SO ORDERED.**

Dated:      New York, New York
            April 20, 2015

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

31

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**Attorney for Plaintiffs:**
Richard S. Busch, Esq.
Andrew Coffman, Esq.
King & Ballow
315 Union Street, Suite 1100
Nashville, TN 37201

**Attorney for Sony:**
Marc S. Reiner, Esq.
Sherli Yeroushalmi, Esq.
Hand Baldachin & Amburgey LLP
8 West 40th Street, 12th Floor
New York, NY 10018